J-A19022-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| BREHON LA-VAAN RAWLINGS | |
| Appellant | No. 1597 EDA 2015 |

Appeal from the Judgment of Sentence March 9, 2015
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0002086-2013

BEFORE:  FORD ELLIOTT, P.J.E., OTT, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED NOVEMBER 17, 2016**

Brehon La-Vaan Rawlings appeals from the judgment of sentence entered March 9, 2015, in the Delaware County Court of Common Pleas. The trial court imposed an aggregate sentence of 25 to 50 years' imprisonment following Rawlings's jury conviction of rape, robbery, kidnapping, criminal conspiracy,[1] and related charges for his participation in the kidnapping and sexual assault of the victim on Christmas night in 2012. On appeal, Rawlings challenges the trial court's denial of his pre-trial motion to suppress the victim's out-of-court identification and his confession to police, his challenge to the weight and sufficiency of the evidence supporting

_____

[*] Former Justice specially assigned to the Superior Court.

[1] **See** 18 Pa.C.S. §§ 3121, 3701(a)(1)(ii), 2901(a)(3), and 903, respectively.

his convictions, and his post-sentence motion for a new trial based upon a ***Brady***[2] violation.[3]  For the reasons below, we affirm.

The facts underlying Rawlings's conviction, as gleaned from the trial transcript, are as follows.  At approximately 11:30 p.m. on December 25, 2012, the victim was sitting alone in her car in the parking lot of George's Water Ice on Marshall Road in Upper Darby, Pennsylvania.  She was looking at her cell phone when three unknown black men approached her car door and put a gun to the window.  The victim described the man holding the gun, later identified as Rawlings, as wearing a blue hooded sweatshirt with "Aero" written on the front and carrying a backpack.  She also stated he wore tan gloves and a mask that covered the lower half of his face, although she was able to see his eyes and his complexion.[4]  ***See*** N.T., 11/5/2014, at 89-92, 113.

When the victim tried to leave the car, Rawlings hit her in the face with the butt of the gun and told her to "move over."  ***Id.*** at 92.  He forced her into the passenger seat, and sat in the driver's seat.  The other two men

_____

[2] ***Brady v. Maryland***, 373 U.S. 83 (1963).

[3] We have reordered Rawlings's issues on appeal for purposes of disposition.

[4] While she was able to see her attackers during the first few minutes of the ordeal, the victim acknowledged that shortly after the men entered her car, she pulled her hooded sweatshirt over her face and cinched it so they would think she did not see their faces.  ***See*** N.T., 11/5/2015, at 138.

entered the back seat of the car. The victim described one attacker, later identified as co-defendant Kewon Matthews, as a dark-skinned male, wearing a scarf around the lower part of his face, and a hooded sweatshirt and jacket. She described the other male, later identified as co-defendant Kevin Jones, as having very light skin, and copper-brown hair.[5] ***See id.*** at 92-95.

Rawlings demanded money from the victim. When she told him she had no cash, he started driving towards Cobbs Creek, intending to have her withdraw money from an account using one of her debit or credit cards. ***See id.*** at 95-97. About 20 minutes later, Rawlings pulled over and Matthews moved to the front passenger seat, forcing the victim into the back seat with Jones. ***See id.*** at 99-100. Jones told the victim she "was going to have to perform oral sex on all of them if [she] ever wanted to see [her] daughter again." ***Id.*** at 100. He then forced her to perform oral sex on him, while Matthews held the gun to her head. The victim stated that she repeatedly vomited, causing Jones to briefly stop, and then force her to continue again. At some point, Rawlings pulled the car over, and Matthews

_____

[5] Both Jones and Matthews entered guilty pleas, and testified for the Commonwealth at Rawlings's trial. Jones's account of the incident largely corroborated the victim's testimony. ***See*** N.T., 11/5/2014, at 226-244. Matthews's statement to police corroborated the victim's account, but he denied making that prior statement at Rawlings's trial. ***See*** N.T., 11/7/2014, at 156-166.

and Jones switched seats. *See id.* at 100-101. Matthews then forced the victim to perform oral sex on him, while Jones held the gun to her head. The victim continued to vomit, forcing Matthews to stop and start again. *See id.* at 101-102. Finally, Rawlings pulled off the road again, and he then entered the back seat, while Jones drove the car. Rawlings, too, forced the victim to perform oral sex, however, when she continued to vomit, he "pulled [her] pants down and raped [her] vaginally."[6] *Id.* at 102-103. She claimed he told her, "You're the first white girl I've ever had." *Id.* at 103. The victim stated Rawlings attempted to enter her anally, but he stopped when she cried. *See id.* at 103-104.

The men continued to drive around for several hours. They used the victim's cell phone to make calls, and stopped to purchase marijuana. The victim stated: "At one point, they were smoking marijuana and asked me if I were to smoke [it] if it would calm me the F down." *Id.* at 104. She refused. They also forced her to speak briefly to her mother, who kept calling her cell phone to find out where she was. *See id.* 105-106.

---

[6] At trial, the victim testified she was unsure whether or not Rawlings wore a condom, or ejaculated while he raped her. *See* N.T., 11/5/2014, at 115-116, 157. However, Rawlings introduced into evidence a Rape Information Sheet, completed by the investigating officer, which indicated the victim stated Rawlings did **not** use a condom and did ejaculate when he vaginally raped her. *See id.* at 157-160, Exhibit D-1, Rape Information Sheet, dated 12/26/2012. *See also* N.T., 11/7/2014, at 5, Exhibit C-26, Sexual Assault Nurse Examiner (SANE) Notes, dated 12/26/2012 (victim reported assailant ejaculated vaginally).

At approximately 5:00 a.m., the victim smelled kerosene and saw the men wiping down the inside of her vehicle. Before leaving, Rawlings told her:

> [W]e've had a fun night. If you go to the police, we will kill you and your family and then he said now you can go home and take care of your kid and we'll throw the keys under the car.

*Id.* at 111. The three assailants then left the scene with her Coach handbag and wristlet, containing her credit cards and identification, her cell phone, camera, GPS, and various items of jewelry. After waiting a short time until she believed it was safe, the victim retrieved her keys and drove to a nearby gas station to call her boyfriend. *See id.* at 111-112. When he did not answer the call, she drove to his house. After the victim told him about the ordeal, her boyfriend drove her directly to the police station. *See id.* at 117-118.

While the victim was at the police station, the officers received a report of a disturbance at a home on Radbourne Road in Upper Darby. The female homeowner reported she overheard "some kind of argument … between her son and his friends and they said something about there being a gun." *Id.* at 200. When the officers arrived, the homeowner let them in the house and they encountered four young males, one sleeping on the couch and three others downstairs in her son's room. The homeowner also

told the officers that one other male had left with a bag before they arrived.[7] The homeowner then asked the officers to go downstairs and look for a gun. Although they did not recover a gun, they did find a Coach purse that seemed out of place in a boy's bedroom. *See id.* at 201-202.

After confirming with the homeowner that the purse did not belong to her, the officers sent a photo of the handbag to headquarters to see if it matched the purse stolen from the rape victim. The victim identified the purse as the one stolen from her earlier that evening, and the police transported her to the Radbourne Road address to see if she could identify any of the four males as her attackers. When the victim arrived, the police brought out the men one at a time, and the victim positively identified Jones[8] and Matthews, as two of the three men who kidnapped and assaulted her. She stated the other two young men were not involved. *See id.* at 202-206.

Both Jones and Matthews, who were 17 years old at the time of the incident, were arrested and provided statements to the police admitting their

---

[7] *See* N.T., 11/6/2014, at 87-88. Both Jones and Mary Novoa, the homeowner, identified Rawlings was the male who left the home before the police arrived. *See* N.T., 11/5/2014, at 248-249; N.T., 11/7/2014, at 85-86.

[8] Jones was wearing a scarf that matched the description provided by the victim. One officer noticed Jones tried to discard the scarf when they brought him out of the house for the show-up identification. *See* N.T., 11/6/2014, at 91.

involvement in the kidnapping, sexual assault, and robbery of the victim. During the interview, Jones implicated Rawlings, whom he knew as "Bre." *Id.* at 261. He also took the officers to Rawlings's home. *Id.* Thereafter, the police created a black and white photo array of Rawlings and seven other men with similar facial characteristics to show to the victim on the evening of December 26, 2012. Without prompting, the victim positively identified Rawlings as the man who vaginally raped her. *See* N.T., 11/6/2014, at 125-127, 247-249. *See also* N.T., 10/25/2013, at 100 (victim testifying during the suppression hearing that she was "[p]ositive" the man she identified in the photo array was one of her attackers).

The police subsequently obtained both an arrest warrant for Rawlings and a search warrant for his home. When they executed the warrants, they recovered the black backpack, mask, and tan gloves he used during the robbery. *See* N.T., 11/6/2014, at 128-129, 136-138. Rawlings later provided a statement to police admitting his involvement in the crime.[9] *See id.* at 269-272. During a break in the interview, he led police to a property in East Lansdowne where he hid the gun used in the incident.[10] *See id.* at 274-276.

---

[9] In his signed statement, Rawlings admitted he used a condom when he assaulted the victim. *See* N.T., 11/6/2014, at 271.

[10] The officer who accompanied Rawlings testified the gun was secreted inside a used Cheetos bag that was hidden under leaves. *Id.* at 274-275.
*(Footnote Continued Next Page)*

Rawlings was subsequently arrested and charged with 40 crimes including rape, robbery, kidnapping, and criminal conspiracy. He filed a pretrial motion seeking suppression of the victim's out-of-court identification, as well as his statement to police. Following a hearing conducted on October 25, 2013, the court denied the suppression motion. The case proceeded to a jury trial on November 3, 2014. Prior to trial, both Jones and Matthews entered guilty pleas and both, consequently, testified for the Commonwealth at Rawlings's trial. On November 19, 2014, the jury returned a verdict of guilty on all charges, namely, robbery of a motor vehicle, rape, kidnapping, robbery, involuntary deviate sexual intercourse, theft, indecent assault, terroristic threats, possession of a weapon, and five counts of criminal conspiracy.[11]

On March 9, 2015, Rawlings was sentenced to an aggregate term of 25 to 50 years' imprisonment, followed by five years' probation.[12] On March

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯

The officer emphasized the police would not have found the gun if Rawlings had not led them there because "[t]he bag was not visible." **_Id._** at 275.

[11] **See** 18 Pa.C.S. §§ 3702(a), 3121(a), 2901(a)(3), 3701(a)(1)(ii), 3123(a), 3912(a), 3126(a)(2), 2706(a)(1), 907(b), and 903, respectively.

[12] The court imposed the following consecutive standard range sentences: (1) rape, 72 to 144 months' imprisonment; (2) robbery, 48 to 96 months' imprisonment; (3) IDSI, 72 to 144 months' imprisonment; (4) kidnapping, 48 to 96 months' imprisonment; (5) conspiracy (rape), 60 to 120 months' imprisonment; and (6) possession of a weapon, five years' probation. The trial court imposed concurrent terms of 36 to 72 months' incarceration for robbery of a motor vehicle, and six to 12 months' incarceration for terroristic threats. All of the remaining charges merged for sentencing purposes. We
_(Footnote Continued Next Page)_

19, 2015, he filed two post-sentence motions, one seeking to reduce his sentence, and the other challenging the weight of the evidence supporting the verdict and seeking a new trial based on after-discovered evidence. Following a hearing, the court amended Rawlings's sentence so that his probationary term for terroristic threats would run concurrently with his prison term. In all other respects, the court denied Rawlings's post-sentence relief. This timely appeal followed.[13]

In his first issue, Rawlings contends the trial court erred in denying his motion to suppress the victim's out-of-court identification. Rawlings argues the photo array the police showed to the victim was "unduly suggestive" since Rawlings was the only person in the array wearing a hooded sweatshirt. Rawlings's Brief at 24. He insists his "unique attire, matching the type of shirt worn by the complainant's attacker on Christmas night, made his photograph stand out more than the others contained in the array." *Id.* at 23. Because the victim only saw a portion of her attacker's face, late at night, for a brief period, Rawlings argues the suggestiveness of

*(Footnote Continued)* ───────────

also note the Sexual Offenders Assessment Board determined Rawlings did not meet the criteria for classification as a sexually violent predator under the Sexual Offenders Registration and Notification Act ("SORNA"), 42 Pa.C.S. §§ 9799.10-9799.41. *See* N.T., 3/9/2015, at 4.

[13] On May 27, 2015, the trial court ordered Rawlings to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Rawlings complied with the court's directive, and after receiving an extension of time, filed a concise statement on September 11, 2015.

the identification procedure "created a substantial likelihood for irreparable misidentification." *Id.* at 24. Moreover, because the search warrant for his home was prepared based on the victim's identification, he further asserts the warrant was "constitutionally defective and invalid." *Id.* at 26.

Our review of an order denying a motion to suppress is well-established:

> We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.
>
> An appellate court, of course, is not bound by the suppression court's conclusions of law. However, it is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony.

*Commonwealth v. Davis*, 17 A.3d 390, 393 (Pa. Super. 2011) (citation omitted), *appeal denied*, 29 A.3d 371 (Pa. 2011).

When considering a challenge to a photo array,

> [o]ur Supreme Court has instructed that a photographic identification is unduly suggestive if, under the totality of the circumstances, the identification procedure creates a substantial likelihood of misidentification. *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 112 (2004) (citation omitted).
>
> > Whether an out-of-court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances. We will not suppress such identification unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

- 10 -

> ***Commonwealth v. Burton***, 770 A.2d 771, 782
> (Pa.Super.2001) (citations and quotations omitted)[, *appeal
> denied*, 868 A.2d 1197 (Pa. 2005), *and overruled on other
> grounds*, ***Commonwealth v. Mouzon***, 812 A.2d 617 (Pa.
> 2002)]. The variance between the photos in an array does not
> necessarily establish grounds for suppression of a victim's
> identification. ***Id.*** "Photographs used in line-ups are not unduly
> suggestive if the suspect's picture does not stand out more than
> those of the others, and the people depicted all exhibit similar
> facial characteristics." ***Commonwealth v. Fisher***, 564 Pa. 505,
> 769 A.2d 1116, 1126 (2001). "[E]ach person in the array does
> not have to be identical in appearance." ***Burton***, 770 A.2d at
> 782. The photographs in the array should all be the same size
> and should be shot against similar backgrounds.
> ***Commonwealth v. Thomas***, 394 Pa.Super. 316, 575 A.2d 921
> (1990).

***Commonwealth v. Kendricks***, 30 A.3d 499, 504 (Pa. Super. 2011), *appeal*

*denied*, 46 A.3d 716 (Pa. 2012).

Here, the trial court found the photo array prepared by the police was

not unduly suggestive. The court opined:

> [Upper Darby Police Detective Brad Ross] generated a
> random computer photographic array through the Pennsylvania
> Justice Network [(JNET)] that contained photographs of eight
> black men who appeared to be of similar age and had similar
> facial features and facial hair as [Rawlings]. The victim selected
> [Rawlings's] picture quickly without prompting. At the
> suppression hearing, [Detective] Ross' testimony was
> uncontradicted. [Rawlings] presented no evidence or testimony
> that would establish that the identification procedure was so
> impermissibly suggestive as to give rise to a very substantial
> likelihood of irreparable misidentification.
>
> * * * *
>
> Here, [Rawlings's] picture does not stand out from the
> other pictures in the photographic array; thus, there was no
> substantial likelihood of misidentification.

Order Denying Motion to Suppress and for Severance, 12/4/2013, at 12.

Upon our review of the record, we find no reason to disagree with the trial court. Upper Darby Police Detective Brad Ross testified he used JNET to randomly place Rawlings's photo among photos of seven other young men. *See* N.T., 10/25/2013, at 112. All of the men in the black and white photo array are of comparable age, with similar hair and facial characteristics. *See id.* at Exhibit CS-1, photo array. Although Rawlings appears to be the only suspect wearing a hooded sweatshirt, that fact alone is not controlling. *See Burton*, *supra*, 770 A.2d at 782 (defendant's assertion that he was the only person in the photo array wearing a white t-shirt, the attire worn by the perpetrator, did not make the array unduly suggestive when all of the men in the array were close in age, "with short haircuts and facial hair," and wearing light colored t-shirts, and one was wearing a white turtleneck). Further, the victim testified that when the officers showed her the photo array, they simply asked her "if anybody looked familiar." N.T., 10/25/2013, at 100. She stated she identified Rawlings, and she was "positive" of the identification. *Id.* Because we agree Rawlings has failed to demonstrate the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," Rawlings's first issue warrants no relief.[14] *Burton*, *supra*, 770 A.2d at 782.

_____

[14] Likewise, because we conclude the photo array was not unduly suggestive and the victim's identification of Rawlings was, therefore, proper, we need
*(Footnote Continued Next Page)*

- 12 -

Next, Rawlings argues the trial court also abused its discretion when it denied his motion to suppress his confession. Our review of the admissibility of a defendant's confession is well-settled:

> A confession obtained during a custodial interrogation is admissible where the accused's right to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights. The test for determining the voluntariness of a confession and whether an accused knowingly waived his or her rights looks to the totality of the circumstances surrounding the giving of the confession.
>
> *Commonwealth v. Jones*, 546 Pa. 161, 170, 683 A.2d 1181, 1189 (1996) (citations omitted). 'The Commonwealth bears the burden of establishing whether a defendant knowingly and voluntarily waived his *Miranda* 'rights.' *Commonwealth v. Bronshtein*, 547 Pa. 460, 464, 691 A.2d 907, 913 (1997) (citation omitted).

*Commonwealth v. Davis*, 861 A.2d 310, 317 (Pa.Super.2004), *appeal denied*, 582 Pa. 708, 872 A.2d 171 (2005).

> When deciding a motion to suppress a confession, the touchstone inquiry is whether the confession was voluntary. Voluntariness is determined from the totality of the circumstances surrounding the confession. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily.

*(Footnote Continued)* ─────────────────

not address Rawlings's contention that the probable cause affidavit supporting the search warrant of his home was tainted by the improper identification. *See* Rawlings's Brief at 24-27.

> ***Commonwealth v. Nester***, 551 Pa. 157, 162–163, 709 A.2d
> 879, 882 (1998) (citations and footnote omitted).
>
>> When assessing voluntariness pursuant to the totality of
>> the circumstances, a court should look at the following
>> factors: the duration and means of the interrogation; the
>> physical and psychological state of the accused; the
>> conditions attendant to the detention; the attitude of the
>> interrogator; and any and all other factors that could drain
>> a person's ability to withstand suggestion and coercion.
>
> ***Id.*** at 164, 709 A.2d at 882 (citations omitted). "The
> determination of whether a confession is voluntary is a
> conclusion of law and, as such, is subject to plenary review."
> ***Commonwealth v. Templin***, 568 Pa. 306, 310, 795 A.2d 959,
> 961 (2002), *citing* ***Nester***, ***supra***.

***Commonwealth v. Harrell***, 65 A.3d 420, 433–434 (Pa. Super. 2013),

*appeal denied*, 101 A.3d 785 (Pa. 2014).

In the present case, Rawlings contends his confession was involuntary

based upon the five factors listed above. With regard to the first factor

(duration and means of interrogation), he argues that while the interrogation

lasted only "slightly over an hour," he denied all involvement in the robbery

and sexual assault for the first ten to fifteen minutes until he was pressured

by Detective Ross to confess. Rawlings's Brief at 29. He notes his initial

denials were not included in the statement, and he provided only one-word

answers when he finally acknowledged his involvement. ***Id.*** With regard to

the second factor (physical and psychological state of accused), Rawlings

emphasizes he was only 19 years old, and had been forcefully removed from

his home, where the police broke down his front door, before being

transported to the station. ***See id.***

- 14 -

Rawlings asserts the third factor (conditions attendant to detention) also "strikes against the voluntariness of [his] confession." *Id.* at 30. He explains he was alone in the police station after being "forced from his home" and informed "that people he knew were now implicating him in the crime" and the victim had identified him. *Id.* Moreover, with regard to the fourth factor (attitude of the interrogator), Rawlings insists Detective Ross "had no interest in hearing [his] denial about his involvement in the robbery and rape of the [victim]." *Id.* Indeed, Rawlings described himself as a "[p]sychologically distraught" 19-year old who tried to explain to the detective that he was not involved in the incident. *Id.* at 31. However, he claims when his denials "f[e]ll on deaf ears, [he] felt he had no choice but to confess to the crimes charged." *Id.* at 31.

The suppression court did not credit Rawlings's testimony about the custodial interrogation. Based on the judge's 53 Findings of Fact, she concluded as a matter of law that Rawlings was provided with his *Miranda*[15] warnings, which he knowingly and voluntarily waived. *See* Order Denying Motion to Suppress and for Severance, 12/4/2013, at 1-13. The court noted Rawlings "is an adult and had familiarity with the criminal justice system." *Id.* at 13. Further, the trial court opined:

> The ensuing interview was neither long nor overbearing, lasting a little over an hour. There is nothing in the record to

---

[15] *Miranda v. Arizona*, 384 U.S. 436 (1966).

indicate the relentless grilling generally associated with coercive questioning. Rawlings gave absolutely no indication during the interview that he was unable to comprehend his rights or the significance of his waiver; he was not under the influence of drugs or alcohol; he was never denied food, drink, or the use of a bathroom; and he appeared cooperative.

Finally, Rawlings's statement itself amply demonstrated his ability to answer all questions put to him, concerning both his rights and the circumstances of the crime, in an intelligent, responsive fashion, demonstrating that he had sufficient perception and intelligence to appreciate his rights and the significance of his waiver. Additionally[,] Rawlings testified at the suppression hearing. On examination by his attorney, Rawlings admitted that the gun he led police to was the gun used in the incident.[16]

*Id.*

Our review of the record reveals no basis to disturb the ruling of the trial court. During the suppression hearing, Detective Ross acknowledged that before he began questioning Rawlings, he explained to Rawlings why he was arrested, that is, both his co-defendants and the victim identified Rawlings as the third assailant. *See* N.T., 10/25/2013, at 149. Although Rawlings initially denied his involvement, Detective Ross stated the denial was short-lived, noting, "I think maybe we went back and forth for 10 minutes, maybe." *Id.* Moreover, the detective testified he did not bring his firearm into the interview, and Rawlings was not handcuffed. *See id.* at 151. Further, Detective Ross also denied ever telling Rawlings he could go

---

[16] *See* N.T., 10/25/2013, at 241-242 (Rawlings admitting the gun he led the officers to was "the gun that was used" in the crime).

home if he confessed or that things would be easier for him if he admitted his involvement in the incident. **See id.** at 159.

While we recognize Rawlings's testimony differed from the detective's testimony,[17] we remind him "it is the suppression court's prerogative to pass on the credibility of the witnesses and the weight to be given to their testimony." **Commonwealth v. Hudson**, 92 A.3d 1235, 1241 (Pa. Super. 2014), *appeal denied*, 106 A.3d 724 (Pa. 2014). Because the court's findings are supported by the record, and its legal conclusions are correct, Rawlings is entitled to no relief on his second issue.

In his next claim, Rawlings challenges the sufficiency of the evidence supporting his conviction. Specifically, he argues "the Commonwealth failed to provide evidence at trial that was sufficient to enable the jury to find that [he] was the third attacker beyond a reasonable doubt." Rawlings's Brief at 35.

When reviewing the sufficiency of the evidence supporting a conviction,

_____

[17] Specifically, Rawlings testified during the suppression hearing that the officers who arrested him called him a "rapist" and banged his head against the wall. **See** N.T., 10/25/2013, at 200. Further, he claimed Detective Ross told him "if you didn't confess you won't see the day of light no more," and insisted the police had DNA and surveillance footage linking him to the crime. **Id.** at 205. Rawlings also stated Detective Ross told him it would be easier for him if he confessed to the crime, and that he was not entitled to a lawyer since he was "grown." **Id.** at 206, 209.

we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the [fact finder's] beyond a reasonable doubt. ***Commonwealth v. Murray***, [623] Pa. [506], 83 A.3d 137, 150–51 (2013). Whether sufficient evidence exists to support the verdict is a question of law; thus, our standard of review is de novo and our scope of review is plenary. ***Id.*** at 151.

***Commonwealth v. Patterson***, 91 A.3d 55, 66 (Pa. 2014), *cert. denied*, 135 S. Ct. 1400 (U.S. 2015). Furthermore, "the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence[,]" and an appellate court will not substitute its credibility determination for that of the jury. ***Commonwealth v. Cousar***, 928 A.2d 1025, 1033 (Pa. 2007), *cert. denied*, 553 U.S. 1035 (2008).

Preliminarily, we note that in his concise statement, Rawlings presented this issue as follows: "The evidence was insufficient to support a verdict of guilty on all the charges." Concise Statement of Matters Complained of on Appeal, 9/11/2015, at ¶ 5. Because Rawlings failed to specify how the evidence was insufficient or "which element of the charges the Commonwealth has failed to prove," the trial court implied that we could find this claim waived. Trial Court Opinion, 10/14/2015, at 6. ***See Commonwealth v. Tyack***, 128 A.3d 254, 260 (Pa. Super. 2015) (finding vague Rule 1925(b) statement was insufficient to preserve issue for appeal). Nevertheless, rather than waiving the issue, the trial court discussed

- 18 -

Rawlings's sufficiency claim on the merits. Accordingly, we too decline to find Rawlings's claim waived.

The trial court addressed Rawlings's sufficiency argument as follows:

[T]here is overwhelming evidence supporting [Rawlings's] convictions. The victim identified [Rawlings] from a photo array the day of the incident. The victim at trial also made a positive in-court identification of [Rawlings] as the male who approached her car with a weapon, hit her with the gun, shoved her into her car and then drove her car away with her in it. The victim thoroughly detailed [Rawlings's] involvement in the crimes that night including his sexual assault and vaginal rape of her. The victim's testimony was corroborated by the testimony of Kevin Jones, a co-defendant in this case. Mr. Jones admitted his involvement in these crimes and also testified about [Rawlings's] involvement. The testimony of the victim and Mr. Jones was consistent as to what transpired that night and each actor's involvement.

Furthermore, [Rawlings] after his arrest provided a signed statement admitting his involvement in the crimes. During his initial interview by the [p]olice, [Rawlings] led them to a property in Upper Darby Township where he stated the gun used in the incident could be found on a lawn in a "Cheetos" bag. The police recovered the gun exactly where [Rawlings] said it was located. [Rawlings] testified at his suppression hearing. On examination by his attorney, [Rawlings] admitted that the gun he led police to was the gun used in the incident. Accordingly, [Rawlings's] claims that the evidence was insufficient to support a verdict of guilty on all the charges is patently meritless.

Trial Court Opinion, 10/14/2016, at 7-8 (record citations omitted).

On appeal, Rawlings does not contend the Commonwealth failed to prove any of the specific elements of his convictions. Rather, he argues the evidence was insufficient to prove he was the third assailant. First, he reiterates his claim that the photo array was suggestive and his confession was involuntary. **See** Rawlings's Brief at 35. As we have already concluded

these claims are meritless, we need not address them again. ***See supra*** at 9-17.

Second, he maintains both Jones and Matthews "had a material interest in implicating [Rawlings] before and during trial." Rawlings's Brief at 35. Notably, he states Matthews admitted he did not like Rawlings, and Jones agreed to testify only in the hope of receiving a favorable plea deal. ***Id.*** The jury was well aware of the possible motives both Matthews and Jones had for testifying against Rawlings. ***See*** N.T., 11/6/2014, at 21-23; 11/7/2014, at 172. As the finder of fact, the jury was permitted to believe all, part, or none of the co-defendants' testimony. ***Cousar***, ***supra***. Simply because a witness had a motive to testify falsely does not render the evidence insufficient. Here, the victim's testimony and Rawlings's confession were more than sufficient to support the jury's verdict.

Third, Rawlings contends the victim's testimony that he was the third attacker is controverted by the physical evidence. He points to the victim's statement on the Rape Information Sheet, which indicates the rapist ejaculated and did not wear a condom. ***See*** N.T., 11/5/2014, at 157-160, Exhibit D-1, Rape Information Sheet, dated 12/26/2012. However, the vaginal swabs from the victim's rape kit produced none of Rawlings's DNA. Rawlings also emphasizes the police were never able to locate the distinctive sweatshirt the third attacker wore, even though they recovered a black backpack and face mask from Rawlings during his arrest. ***See*** Rawlings's Brief at 36. Moreover, one of the Commonwealth witnesses, who saw

- 20 -

Rawlings both before and after the attack, described Rawlings as "wearing a grey thermal shirt and red Nike jacket while carrying a green backpack." *Id.* *See* N.T., 11/7/2014, at 70-71.

Nevertheless, despite these apparent inconsistencies, the jury was presented with the victim's positive identification of Rawlings, both Jones's and Matthews's statements implicating Rawlings, and Rawlings's own statement admitting his culpability for the crimes. Furthermore, Rawlings led police to the exact spot where the gun used in the robbery was hidden. The fact that none of his DNA was recovered from the victim's clothing, the sweatshirt he used in the crime was never found, and one witness testified he was wearing different clothing is not dispositive. As this Court has often stated:

> [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 716, (Pa. Super. 2015), *appeal denied*, 125 A.3d 1198 (Pa. 2015). *See also id.* at 721 ("The victim's uncorroborated testimony is sufficient to support a rape conviction."). Accordingly, upon our review of the record, we agree with

the conclusion of the trial court that Rawlings's sufficiency claim is meritless.[18]

Rawlings next argues the jury's verdict was against the weight of the evidence. Our review of a challenge to the weight of the evidence is well-settled: [19]

> A weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in

_____

[18] Furthermore, to the extent Rawlings contends the evidence was insufficient to support his conspiracy convictions, we again disagree. Rawlings acknowledges the testimony of Jones and Raquan Burgess, if believed, was sufficient to demonstrate he entered into an agreement to commit robbery. **See** Rawlings's Brief at 37-38. **See also** 18 Pa.C.S. § 903(a). However, he claims there was "no testimony presented regarding any conspiratorial agreements to rob the [victim's] motor vehicle, to rape her, to commit involuntary deviate sexual intercourse with her, or to kidnap her." Rawlings's Brief at 38. We remind Rawlings:

> The conspiratorial agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode.

**Commonwealth v. Feliciano**, 67 A.3d 19, 26 (Pa. Super. 2013). Here, the three cohorts specifically sought out a victim to rob, entered the victim's car together while pointing a gun at her, drove off in her car together, and took turns sexually assaulting her while one of the others held a gun to her head. Moreover, the victim testified Jones told her she "was going to have to perform oral sex on **all of them** if [she] ever wanted to see [her] daughter again." N.T., 11/5/2014, at 100 (emphasis supplied). This evidence was sufficient to establish the co-defendants entered into an agreement to commit the crimes charged.

[19] We note Rawlings properly preserved his weight of the evidence challenge in a timely filed post-sentence motion. **See** Pa.R.Crim.P. 607(A)(1).

favor of acquittal that a guilty verdict shocks one's sense of justice. On review, an appellate court does not substitute its judgment for the finder of fact and consider the underlying question of whether the verdict is against the weight of the evidence, but, rather, determines only whether the trial court abused its discretion in making its determination.

***Commonwealth v. Lyons***, 79 A.3d 1053, 1067 (Pa. 2013) (citations omitted), *cert. denied*, 134 S.Ct. 1792 (U.S. 2014).

Rawlings's weight claim is a restatement of his prior arguments on appeal. Namely, he asserts his confession was involuntary, and the victim's out-of-court identification was tainted by a suggestive photo array, particularly since she admittedly saw his face for only a few minutes in the dark before "she cinched the hood of her sweatshirt tightly around her face to prevent her from seeing the attackers for the majority of the night." Rawlings's Brief at 44, 45. He also, once again, claims his co-defendants had "vested interests in accusing [him] of committing these crimes[.]" ***Id.*** Furthermore, he emphasizes the "crucial lack of [Rawlings's] DNA in the [victim's] rape kit,"[20] as well as the failure of the police to recover the sweatshirt worn by the attacker. ***Id.*** at 45, 46.

Here, the trial court denied Rawlings's weight of the evidence claim, finding "the evidence against [Rawlings] does not shock the Court's sense of justice." Trial Court Opinion, 10/14/2015, at 9. Rawlings provides us with

---

[20] Although Rawlings acknowledges his DNA was found mixed with vomit on Jones's pants, he contends that fact is irrelevant since "this DNA could have gotten on the pants at any time." Rawlings's Brief at 46.

no basis to conclude the court abused its discretion. Although some of the evidence presented was contradictory and incomplete, the jury's credibility determinations were supported by the record and do not shock our conscience. Once believed, the victim's identification of Rawlings as the third attacker, and his inculpatory statement to police, clearly supported the jury's verdict. The lack of DNA evidence and the unrecovered sweatshirt do not undermine the jury's determination that Rawlings was the third perpetrator.[21] Accordingly, Rawlings's challenge to the weight of the evidence fails.

Lastly, Rawlings argues the trial court erred when it denied his post-sentence motion for a new trial based on a purported ***Brady***[22] violation. Specifically, Rawlings claims the Commonwealth withheld from him at the time of trial "material, impeachable statements" made by the victim, namely the Victim Impact Statement submitted during the sentencing hearing.

_____

[21] Indeed, there are many explanations for the lack of DNA evidence, including the victim may have been mistaken as to whether or not her rapist wore a condom. ***See*** N.T., 11/5/2014, at 115-116 (victim admitting she did not know whether Rawlings wore a condom when he raped her vaginally). In fact, in his confession, Rawlings stated he did wear a condom. ***See*** N.T., 11/6/2014, at 271. Further, the fact that Rawlings was observed wearing different clothing before and after the robbery is immaterial since he clearly attempted to disguise his appearance when he approached the victim wearing a facemask. Moreover, particularly damaging to his claims, is the fact that Rawlings knew exactly where the gun used in the robbery was hidden.

[22] ***Brady v. Maryland***, 373 U.S. 83 (1963).

Rawlings's Brief at 39. **See also** N.T., 4/21/2015, at 4-5. Rawlings claims the victim averred in the statement that her attacker ejaculated during the vaginal rape. Rawlings's Brief at 40. He insists this statement was material and exculpatory because (1) "it provides further contradiction to her in-court testimony and could have led to her impeachment[,]" and (2) "the credibility of the [victim's] testimony and identification of [Rawlings] was vital to the jury's determination in this matter." **Id.** at 41.

> Our review of an alleged **Brady** violation is guided by the following:
>
> To establish a **Brady** violation, a defendant must demonstrate that: (1) the evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. The burden rests with the defendant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution."

**Commonwealth v. Antidormi**, 84 A.3d 736, 747 (Pa. Super. 2014) (internal citations omitted), *appeal denied*, 95 A.3d 275 (Pa. 2014). Indeed, "[t]he withheld evidence must have been in the exclusive control of the prosecution at the time of trial." **Commonwealth v. Haskins**, 60 A.3d 538, 547 (Pa. Super. 2012).

Significantly, here, the Victim Impact Statement, upon which Rawlings bases his **Brady** claim, is not included in the certified record on appeal. We remind Rawlings: "Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty." **Commonwealth v. Preston**, 904 A.2d 1, 7 (Pa.

Super. 2006) (*en banc*). Accordingly, because we cannot review the statement, which he claims is crucial to his case, we are unable to determine whether the victim's statement was favorable and material to the defense.[23]

Moreover, Rawlings has also failed to establish the statement was in the Commonwealth's control at the time of trial. Although he acknowledges he does not know when the statement was written by the victim, he asserts the Commonwealth all but admitted it possessed the statement during his trial. *See* Rawlings's Brief at 41. Indeed, he bases this assumption on the fact that, during the post-sentence hearing, the Commonwealth did not deny the statement existed at the time of trial but rather discounted its materiality. *See id.*, *citing* N.T., 4/21/2015, at 6. This circular logic based on assumptions and non-statements is simply insufficient to establish the Commonwealth either willfully or inadvertently withheld exculpatory evidence from Rawlings. Accordingly, Rawlings's **Brady** claim fails.

Judgment of sentence affirmed.

_____

[23] Assuming, however, the written statement is the same as the Victim Impact Statement read by the prosecutor at Rawlings's sentencing hearing, we note that the victim made no mention of whether her rapist ejaculated. *See* N.T., 3/9/2015, at 5-7.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/17/2016